UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------X

JEAN-MICHEL APOLON,

        Plaintiff,

    - against -

THE METRO GROUP, INC., and DANIEL
LAMBERSON,

        Defendants.

------------------------------------------------------------X

**MEMORANDUM AND ORDER**
13-CV-6133 (RRM) (MDG)

ROSLYNN R. MAUSKOPF, United States District Judge.

Plaintiff Jean-Michel Apolon commenced this action on November 5, 2013, alleging

employment discrimination, a hostile work environment, and retaliation in violation of Title VII

of the Civil Rights Act of 1964, as amended 42. U.S.C. § 2003 *et seq.*, the Civil Rights Act of

1866, as amended, 42 U.S.C. § 1981, and New York State Human Right Law ("NYSHRL")

§ 296, against defendants the Metro Group, Inc. ("Metro") and Daniel Lamberson.  (Compl.

(Doc. No. 1).)  Defendants now move for summary judgment pursuant to Federal Rule of Civil

Procedure 56.  (Defs.' Mot. Summ. J. (Doc. No. 28).)  Apolon opposes the motion.  (Pl.'s Opp'n

(Doc. No. 33).)  For the reasons set forth below, defendants' motion is granted.

## BACKGROUND

### I.    Facts[1]

In 1999, Apolon, a black male of Haitian descent, applied for a job with defendant Metro,

a water treatment service company.  (Defs.' 56.1 (Doc. No. 30) at ¶¶ 1, 4–5.)  On July 26, 1999,

Lamberson, a Service Director for Metro, and one of his subordinates, Maurice Jackson,

interviewed Apolon.  (Defs.' 56.1 at ¶¶ 6–7.)  Shortly after, Lamberson hired Apolon as a

---

[1] The following facts – drawn from the parties' Local Rule 56.1 statements and the submissions filed in connection
with this motion – are undisputed unless otherwise noted and are taken in the light most favorable to Apolon.  *See
Giannullo v. City of New York*, 322 F.3d 139, 140–41 (2d Cir. 2003).

Service Technician.  (Defs.' 56.1 at ¶ 12.)  As a Service Technician, Apolon was responsible for completing work orders for Metro and providing on-site water treatment for Metro's customers.  (Defs.' 56.1 at ¶¶ 12–13, 19.)

Apolon received numerous disciplinary memoranda from his supervisors while working at Metro.[2]  On October 2, 2001, Lamberson issued Apolon a disciplinary memorandum for parking violations incurred while driving a company vehicle.[3]  (Defs.' 56.1 at ¶ 24.)  On October 3, 2001, Lamberson issued Apolon a disciplinary memorandum for failing to gain access to six locations to perform work orders.[4]  (Defs.' 56.1 at ¶ 26.)  On November 2, 2001, Lamberson issued Apolon a warning memorandum for failing to gain access to four more job assignments on his work orders.  (Defs.' 56.1 at ¶ 28.)  On November 5, 2001, Apolon was issued a disciplinary memorandum and a verbal warning about his insubordinate behavior toward Metro's Department Administrator, his failure to follow directions regarding the operation of his company-issued truck, and his failure to meet with customers for their scheduled appointments.[5]  (Defs.' 56.1 at ¶¶ 30–31.)  On November 12, 2001, Apolon was issued a disciplinary memorandum and spoken to by a supervisor about a complaint concerning his rudeness and failure to sign a log book at a customer's worksite.[6]  (Defs.' 56.1 at ¶¶ 33–34.)  On March 7,

---

[2] The disciplinary memoranda discussed in this section are not disputed by the parties.  However, the parties dispute whether Apolon had notice of several other disciplinary memoranda.  Such memoranda have not been incorporated into the Court's factual determinations.  (*See* Def.'s 56.1 at ¶¶ 22–23, 38, 73, 89, 123, 126; Pl.'s 56.1 (Doc. No. 34) at ¶¶ 22–23, 38, 73, 89, 123, 126.)

[3] Apolon admits that he received this disciplinary memorandum, but disputes that it was justified.  (Pl.'s 56.1 at ¶ 24.)

[4] Apolon admits that he received this disciplinary memorandum, but disputes that it was justified because of how common access problems are for service technicians and because other service technicians were not written up on similar issues.  (Pl.'s 56.1 at ¶ 26.)  Apolon reiterates this dispute for all other memoranda regarding access problems.  (Pl.'s 56.1 at ¶¶ 28, 41, 44, 50.)

[5] Apolon "disputes that the disciplinary memorandum was justified."  (Pl.'s 56.1 at ¶ 30.)
[6] Apolon does not dispute this occurrence, but states that Metro did not issue disciplinary memoranda to other Service Technicians with similar complaints.  (Pl.'s 56.1 at ¶ 33.)  However, the portion of Lamberson's deposition

2002, Jackson issued Apolon a disciplinary memorandum for failing to return his company vehicle to the shop and for failing to punch out for the day.  (Defs.' 56.1 at ¶ 39.)

At some point in 2002, Apolon's company vehicle privileges were revoked until approximately November 2002.  (Defs.' 56.1 at ¶ 43.)  On November 21, 2002, Jackson issued Apolon a disciplinary memorandum for failing to complete a priority service job assignment. (Defs.' 56.1 at ¶ 41.)  On December 16, 2002, Lamberson issued Apolon a disciplinary memorandum for substandard productivity.  (Defs.' 56.1 at ¶ 44.)  On March 4, 2003, Jackson issued Apolon a disciplinary memorandum for failing to correct inaccuracies in his paperwork. (Defs.' 56.1 at ¶ 46.)  On May 2, 2003, Apolon was issued a disciplinary memorandum for damage he sustained to his company vehicle, in part due to excessive wear on its braking system.[7]  (Defs.' 56.1 at ¶ 48.)  On May 19, 2003, Lamberson issued Apolon a disciplinary memorandum for an excessive number of access problems reported.  (Defs.' 56.1 at ¶ 50.)  On November 19, 2003 Jackson issued Apolon a disciplinary memorandum for failing to report equipment failures.  (Defs.' 56.1 at ¶ 52.)

In August 2004, Apolon was suspended for one day due to his insubordination.  On August 5, 2004, Lamberson issued Apolon a disciplinary memorandum explaining that he was suspended for his unacceptable conduct in leaving Metro premises in a company vehicle without explanation after Lamberson had told Apolon to provide him with his completed work orders for review.  (Defs.' 56.1 at ¶¶ 54–55.)  According to Apolon, he grieved the issuance of this disciplinary memorandum and his suspension was overturned by his union, resulting in back pay for his day of suspension.  (Pl.'s 56.1 at ¶¶ 54–55.)

---

Apolon points to does not support this assertion as it reads, "I'm sure there were cases where I did not write up and document occurrences that took place that were not very positive with Jean over the years, and some I did." (Lamberson Tr. at 28:3–7.)

[7] Apolon disputes that this disciplinary memorandum was justified.  (Pl.'s 56.1 at ¶ 48.)

On November 11, 2004, Apolon was issued a disciplinary memorandum from Jackson for his receipt of six summonses resulting from his usage of a Metro vehicle, three of which he had never turned into Metro. (Defs.' 56.1 at ¶ 57.) On November 17, 2004, Apolon was issued a disciplinary memorandum for his failure to go to the Brooklyn Parking Violations Bureau to retrieve copies of the summonses issued on the Metro vehicle that Apolon drove. (Defs.' 56.1 at ¶ 59.) Jackson spoke to Apolon about this conduct. (Defs.' 56.1 at ¶ 60.)

In March 2005, Apolon received six parking tickets for his company vehicle. (Defs.' 56.1 at ¶ 62.) Jackson issued Apolon a disciplinary memorandum due to the excessive number of parking tickets he incurred. (*Id.*) On April 25, 2005, Jackson issued Apolon a note warning him that he was required to contact the Metro office when he had access problems on a job. (Defs.' 56.1 at ¶ 64.) Jackson again spoke to Apolon about his conduct and told him to "at least act as if you care about the level of service you provide." (Defs.' 56.1 at ¶¶ 64–65.) On May 3, 2005, Jackson issued Apolon a disciplinary memorandum for his "abusive handling" of his company vehicle. (Defs.' 56.1 at ¶ 67.) On November 15, 2005, Jackson issued Apolon a disciplinary memorandum for failing to perform priority service jobs. (Defs.' 56.1 at ¶ 69.)

At some point in 2005, Apolon was permanently re-assigned as a "Helper" rather than a Service Technician. (Defs.' 56.1 at ¶¶ 115, 117, 120–122.) The decision to re-assign Apolon was made by Lamberson and other Service Managers at Metro. (Defs.' 56.1 at ¶ 121.) According to defendants, this decision was made due to Apolon's customer complaints, poor productivity, unsafe driving, and poor communication with the office. (Defs.' 56.1 at ¶ 124.) As a Helper, Apolon still performed the duties of a Service Technician, but his primary responsibility was to assist other Service Technicians. (Defs.' 56.1 at ¶ 119.) Apolon only

worked on his own when he was covering a service route for another employee who was temporarily unavailable. (Defs.' 56.1 at ¶ 120.)

On January 30, 2006, Lamberson issued Apolon a disciplinary memorandum for leaving work early.[8] (Defs.' 56.1 at ¶ 71.) On February 16, 2006, Lamberson issued Apolon a disciplinary memorandum for his unaccounted work time. (Defs.' 56.1 at ¶ 75.) On March 2, 2006, Lamberson issued Apolon a disciplinary memorandum for excessive idling of his company vehicle. (Defs.' 56.1 at ¶ 77.) On March 17, 2006, Apolon was issued a disciplinary memorandum for the discrepancies between his paperwork and the GPS reports from his company vehicle. (Defs.' 56.1 at ¶ 79.) On March 20, 2006, Apolon filed a grievance with his union about Lamberson's "punitive action" and "physical abuses" towards him. (Defs.' 56.1 at ¶ 110.) By "punitive action," Apolon meant his anticipated termination, which did not actually occur until 2013. (Defs.' 56.1 at ¶ 111.) Apolon also stated that, despite his use of the term "physical abuses," Lamberson never touched him. (*Id.*)

On March 2, 2007, Apolon was issued a disciplinary memorandum for failing to properly fill out paperwork relating to his service route. (Defs.' 56.1 at ¶ 81.) On March 8, 2007, Jackson issued Apolon a disciplinary memorandum for his excessive parking violations in his company vehicle. (Defs.' 56.1 at ¶ 83.) On March 14, 2007, Lamberson issued Apolon a disciplinary memorandum for failing to complete paperwork related to his service route. (Defs.' 56.1 at ¶ 85.) On March 19, 2007, Lamberson issued Apolon a disciplinary memorandum for excessively idling his company vehicle. (Defs.' 56.1 at ¶ 87.)

On December 27, 2010, Apolon was given a shovel by another employee and asked to help shovel snow, which Apolon felt was discriminatory. (Defs.' 56.1 at ¶¶ 95–96.) According

---

[8] This disciplinary memorandum also included allegations that Apolon deviated from his assigned work areas while on his service route. Apolon admits to receiving this disciplinary memorandum, but disputes that he deviated from his assigned work area. (Defs.' 56.1 at ¶ 71; Pl.'s 56.1 at ¶ 71.)

to Apolon, "he was the only one asked to stay back to shovel snow while the other employees were assigned routes and work orders for the day." (Pl.'s 56.1 at ¶ 95.) Apolon also alleges that Lamberson discriminatorily danced in front of him in hopes that Apolon would push him. (Pl.'s 56.1 at ¶ 94.) Defendants dispute these events. (Defs.' 56.1 at ¶ 94.) Both parties agree that Apolon refused to shovel snow and was sent home. (Defs.' 56.1 at ¶ 96.) According to Apolon, he successfully grieved to his union about this event and was paid for the day. (Pl.'s 56.1 at ¶ 96.) On June 26, 2012, Apolon was issued a memorandum from Jackson asking him to have more of a positive attitude at work and to improve his cooperation and willingness to work with others. (Defs.' 56.1 at ¶ 97.)

On November 27, 2012, Lamberson sent Apolon and another employee to an assignment on a rooftop after it had been raining and snowing. (Defs.' 56.1 at ¶ 98.) Apolon felt that this assignment was discriminatory because he is Haitian and there was a chance he could catch pneumonia. (Defs.' 56.1 at ¶ 99.) Apolon refused to complete the assignment, was sent home, and was issued a disciplinary memorandum. (Defs.' 56.1 at ¶¶ 100–101.) Apolon acknowledged that Metro could have fired him for the incident, but maintains that he refused the assignment out of concern for his safety. (Defs.' 56.1 at ¶ 100; Pl.'s 56.1 at ¶ 100.)

Apolon alleges two incidents of discriminatory statements made by Lamberson, which defendants dispute. On February 1, 2013, Apolon alleges that as he was walking toward the cafeteria he heard Lamberson say to another employee, "here comes a monkey eating a banana with an eggplant in his hand." (Pl.'s 56.1 at ¶ 103.) According to Apolon, Lamberson did not say his name and Apolon did not ask what Lamberson was talking about. (Defs.' 56.1 at ¶¶ 104–105; Pl.'s 56.1 at ¶¶ 104–105.) On May 24, 2013, Apolon alleges that he heard Lamberson say, "Haitians are the worst." (Pl.'s 56.1 at ¶ 108.) Apolon did not file a claim of discrimination or

complain to anyone about these alleged statements. (Defs.' 56.1 at ¶¶ 107, 109.) However, on May 28, 2013, Apolon did file a grievance with his union regarding Lamberson's denial of his requested vacation days. (Defs.' 56.1 at ¶ 191.)

On July 2, 2013, Apolon was fired after a committee of management personnel reviewed his personnel file following several incidents of insubordination between June 25 and 27, 2013. (Defs.' 56.1 at ¶¶ 170–173.) On June 25 and 26, 2013, Jackson called Apolon's company-issued cell phone as part of a phone response check. (Defs.'s 56.1 at ¶¶ 140, 145–46.) Apolon alleges that he had no knowledge of Metro's phone policy[9] and no knowledge of whether Jackson called him. (Pl.'s 56.1 at ¶¶ 137, 140, 145–46.) According to Apolon, he considered his phone a backup phone because the Service Technicians had their own phones. (Defs.' 56.1 at ¶ 144.) On June 26, 2013, Jackson called the Service Technician that Apolon was helping in order to reach Apolon. (Defs.' 56.1 at ¶ 147.) Jackson told Apolon to turn on his cell phone. (*Id.*) Apolon responded that Jackson was speaking to Apolon right then. (Defs.' 56.1 at ¶ 148.) Apolon did not turn on his cell phone and Jackson told him that he was not cooperating. (*Id.*) According to Apolon, Jackson then hung up the phone without allowing him to explain himself. (Pl.'s 56.1 at ¶ 149.) Apolon filed a grievance with his union against Jackson the same day. (Defs.' 56.1 at ¶ 150; Pl.'s 56.1 at ¶ 150.) According to Apolon, he perceived this phone check to be discriminatory because other employees were not subjected to the same phone check. (Pl.'s 56.1 at ¶ 151.) However, Apolon's grievance did not allege racial or national origin discrimination or disparate treatment. (Defs.' 56.1 at ¶ 153.)

The following day, on June 27, 2013, Apolon was speaking with another employee in the Metro parking lot when Jackson approached. (Defs.' 56.1 at ¶¶ 157–58.) Jackson asked the

---

[9] According to Metro's Employee Handbook, employees are required to keep company-issued cell phones on them at all times. (Defs.' 56.1 at ¶ 137.)

other employee what Apolon was saying, and Apolon responded that he wasn't speaking to Jackson. (Defs.' 56.1 at ¶¶ 158–59.) Jackson said, "You are talking to me this way?" (Defs.' 56.1 at ¶ 160.) Apolon responded, "Who are you?" (*Id.*) According to Apolon, Jackson made a derogatory remark about Apolon's national origin, saying that he "had been used, abused, and beaten up in his country."[10] (Pl.'s 56.1 at ¶ 161.) According to defendants, Jackson told Apolon that the way Apolon was speaking to him was not the proper way to speak to a supervisor. (Defs.' 56.1 at ¶ 162.) The parties agree that in response, Apolon called Jackson, who is also black, a "slave master." (Defs.' 56.1 at ¶¶ 8, 161; Pl.'s 56.1 at ¶ 161.) Jackson then told Apolon to go home for the day. (Defs.' 56.1 at ¶ 163.) However, rather than go home, Apolon locked himself in a company vehicle. (Defs.' 56.1 at ¶¶ 164–65.) Jackson told Apolon to get out of the car, but Apolon instead drove off. (Defs.' 56.1 at ¶¶ 166–67.)

The same day, Apolon was issued a disciplinary memorandum, which stated that he was to receive a three day suspension. (Defs.' 56.1 at ¶ 168.) Lamberson also verbally informed Apolon of the suspension. (*Id.*) The following day, on June 28, 2013, Apolon filed a grievance about the suspension, which did not state that he was subject to any discriminatory remarks. (Defs.' 56.1 at ¶ 169.)

On July 1, 2013, Apolon received a letter from Lamberson, stating that his employment was terminated effective the following day "based upon negative past performance issues, as well as more recent disciplinary issues of unsatisfactory conduct and insubordination." (Defs.' 56.1 at ¶ 170.) On July 2, 2013, Apolon filed a grievance with his union regarding his

---

[10] Apolon's recitation of Jackson's statement in his Rule 56.1 statement does not match his recitations in his deposition transcript and opposition papers. (*Compare* Pl.'s 56.1 at ¶¶ 161–62, *with* Apolon Tr. (Doc. No. 33-3) at 256:24–25, 257:2, *and* Pl.'s Opp'n at 6.) Apolon stated in his deposition that Jackson "claimed[] that I used to get beat up in my country." (Apolon Tr. at 256:24–25, 257:2.) In his opposition papers, Apolon quotes Jackson as saying, "you have been abused and beaten up in your country, and when you come here you think you are somebody." (Pl.'s Opp'n at 6.)

termination.  (Defs.' 56.1 at ¶ 181.)  Apolon's grievance did not state that his termination was discriminatory.  (Defs.' 56.1 at ¶ 182.)  Apolon's union decided not to pursue the grievance on his behalf and issued a letter stating that the grievance had no merit and outlining how to appeal the decision.  (Defs.' 56.1 at ¶¶ 183–84.)  Apolon did not appeal his union's decision.  (Defs.' 56.1 at ¶ 185.)  On August 2, 2013, Apolon filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") regarding his termination and the comments made by Lamberson.  (Defs.' 56.1 at ¶ 186.)

**STANDARD OF REVIEW**

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no genuine issues of material fact in dispute and that one party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a genuine issue of material fact exists, the evidence of the non-movant "is to be believed" and the court must draw all "justifiable" or "reasonable" inferences in favor of the non-moving party.  *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *see also Brosseau v. Haugen*, 543 U.S. 194, 195 n.2 (2004).  Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*,'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original), and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (citing cases).  In other words, the nonmovant must

offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to [its] case." *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (quoting *Celotex*, 477 U.S. at 322) (internal quotation marks omitted) (alteration in original). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo*, 100 F.3d 253, 258 (2d Cir. 1996) (citing *Anderson*, 477 U.S. at 247–48).

## DISCUSSION

### I.    Title VII Claims

Apolon brings claims of employment discrimination, hostile work environment, and retaliation in violation of Title VII against Metro and Lamberson. For the reasons below, defendants are entitled to summary judgment on each Title VII claim.

#### a.  Defendant Lamberson

It is well settled "that 'individuals are not subject to liability under Title VII.'" *Patterson v. Cty. of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004) (quoting *Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000) (per curiam)); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir. 1995) (holding "that individual defendants with supervisory control over a plaintiff may not be held personally liable under Title VII"), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998); *see also St. Louis v. N.Y.C. Health & Hosp. Corp.*, 682 F. Supp. 2d 216, 228 (E.D.N.Y. 2010). Though Metro may be held liable for Lamberson's actions,

Lamberson himself may not be held liable.  Accordingly, Apolon's Title VII claims brought against Lambert are dismissed.

### b.  Time-Barred Claims

Claims brought pursuant to Title VII are subject to the time limitations set forth in 42 U.S.C. § 2000e-5(e)(1).  In New York, an individual must file a charge of discrimination with the Equal Opportunity Employment Commission ("EEOC") "within three hundred days after the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e)(1).  *See, e.g.*, *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 204 (E.D.N.Y. 2014) ("A plaintiff seeking to bring claims pursuant to Title VII must file a complaint with the EEOC or equivalent state agency within 300 days of the challenged conduct.").  "The Supreme Court has held that Title VII 'precludes recovery for discrete acts of discrimination or retaliation that occurred outside the statutory time period.'"  *N.Y.C. Health & Hosp. Corp.*, 682 F. Supp. 2d at 228 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002)).

Apolon filed his complaint with the EEOC on August 2, 2013.  (EEOC Charge (Doc. No. 32-50).)  Therefore, any discriminatory conduct must have occurred on or after October 6, 2012 to be actionable.  Claims based on Apolon's demotion in January 2005, supervisor Paul Henline's notation on a Metro sign in sheet in March 2007, and the incident where Apolon was asked to shovel snow and Lamberson allegedly danced to provoke him in December 2010 are time-barred.

### c.  Discrimination

Apolon's Title VII, § 1981, and NYSHRL claims are each subject to analysis under the burden-shifting framework articulated in *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973).  *See Whethers v. Nassau Health Care Corp.*, 956 F. Supp. 2d 364, 375, 383 (E.D.N.Y.

2013), *aff'd,* 578 F. App'x 34 (2d Cir. 2014) (stating that the *McDonnell Douglas* analysis applies to Title VII discrimination claims and claims brought under § 1981 and NYSHRL). Pursuant to *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a prima facie case by showing (1) that he is a member of a protected class, (2) that he was qualified for the position in question, (3) that he suffered an adverse employment action, and (4) that the circumstances surrounding the adverse employment action give rise to an inference of discrimination. *McDonnell Douglas*, 411 U.S. at 802; *McPherson v. New York City Dept. of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006). The Second Circuit requires little evidence to establish a prima facie case. It is enough that the plaintiff experiences an adverse employment action while others outside of his protected class do not. *Zimmerman v. Assoc. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001).

Once the plaintiff has established a prima facie case, the burden then falls upon the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *McPherson*, 457 F.3d at 215. The defendant satisfies this burden if the reason given, "taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993). Typically, it is not for courts to question the quality or wisdom of the reason, so long as it is not unlawfully discriminatory. *Id.*

In order to survive summary judgment once the defendant has produced a legitimate, non-discriminatory reason for the adverse employment action, the plaintiff must point to evidence that suggests that it is more likely than not that the reasons offered are mere pretext designed to cover up the employer's actual discriminatory intent. *Ferrell v. Leake & Watts Serv., Inc.*, 83 F. App'x 342, 346 (2d Cir. 2003). Thus, the ultimate burden of persuading the

finder of fact that the employer intentionally discriminated lies with the plaintiff at all times during this burden-shifting process. *Holt v. KMI-Cont'l, Inc.*, 95 F.3d 123, 129 (2d Cir. 1996).

### i. Apolon's Prima Facie Case

The parties do not dispute that Apolon – a black male of Haitian descent – is a member of a protected class. Nor do they dispute that Apolon's 2013 suspension and termination qualify as an adverse employment action. Accordingly, the Court's analysis is limited to the contested prongs of the prima facie case. As discussed below, because Apolon has not established that he was qualified for his position, he fails to meet his burden at this step.

### ii. Apolon has Not Established that he was Qualified for his Position.

Apolon fails to meet the second element of his prima facie case – that he was qualified for his position as a Service Technician. This "prong is analyzed in terms of 'whether plaintiff shows satisfactory job performance at the time of the discharge.'" *Williams v. All. Nat'l Inc.*, No. 98-CV-7984 (RCC), 2001 WL 274107, at *4 (S.D.N.Y. Mar. 19, 2001), *aff'd sub nom. Williams v. All. Nat. Inc.*, 24 F. App'x 50 (2d Cir. 2001) (quoting *Thornley*, 104 F.3d at 29). "'The rationale behind this criteria is that the employee must demonstrate that his performance warranted continued employment, thereby raising an inference that some other factor was involved in the decision to discharge him.'" *Id.* (quoting *Stein v. McGraw–Hill*, 782 F. Supp. 207, 211 (S.D.N.Y. 1992)). "Whether job performance was satisfactory depends on the employer's criteria for the performance of the job–not the standards that may seem reasonable to the jury or judge." *Thornley v. Penton Pub., Inc.*, 104 F.3d 26, 29 (2d Cir. 1997). "Thus, courts will rely on the evaluations the plaintiff received from his or her supervisors in determining satisfactory job performance." *Williams*, 2001 WL 274107, at *4.

Here, Apolon's employment history with Metro is riddled with disciplinary memoranda. It is undisputed that Apolon received at least twenty-seven disciplinary memoranda during his employment with Metro. In these memoranda, Apolon was chastised for: his failure to complete work assignments; his mistreatment of customers, coworkers, and Metro vehicles; and his insubordination toward supervisors. Moreover, in 2005 Apolon was re-assigned as a Helper because of his inability to handle the job responsibilities of a Service Technician. (*See* Jackson Decl. (Doc. No. 31-7) at ¶ 13 ("We concluded it that it was necessary to assign Apolon with responsibilities he could handle, in light of the continued deficiencies in his customer relations, his confrontational demeanor, and his failure to follow Company protocols."); Lamberson Tr. (Doc. No. 31-4) at 19:3–8 (listing reasons for Apolon's reassignment "[f]rom customer complaints, poor productivity, to unsafe driving, to leaving an assigned area for personal reasons, poor communication with the office when we tried to reach the individual by phone or pager.").) Even after his reassignment, Apolon's job performance did not improve and continued to be "troublesome, erratic, and inconsistent." (Jackson Decl. at ¶ 16.)

Apolon argues that these disciplinary memoranda do not evidence unsatisfactory job performance because "similarly situated non-Haitian employees with more serious access problems were never written up by defendants." (Pl.'s Opp'n (Doc. No. 33) at 4.) In support of his assertion, Apolon points to the testimony of another Metro employee, Justin Steward. (Akakwam Decl. (Doc. No. 35) at ¶ 3.) However, Steward's testimony fails to show that other employees' access problems were as serious or as frequent as Apolon's access problems. Stewart stated, "I've worked there, I've heard guys just in regular conversation saying, oh, they've had seven no access or you know, so many no access that they've had to, you know, almost get new jobs or like a new route to go to, because they couldn't get access to buildings."

(Steward Tr. (Doc. No. 35-2) at 17:12–19.)  Steward was unable to identify other Service

Technicians with access problems by name, but stated that "all of them have a story like that . . .

. everybody has a bad day."  (*Id.* at 18:3–7.)  The Court gives some weight to Steward's

assertions that most Service Technicians at some point in their employment have a "bad day"

where they fail to gain access to multiple jobs.  However, this assertion highlights defendants'

point that Apolon's access problems were not limited to the occasional "bad day."  In any event,

Apolon's disciplinary memoranda were not limited to access problems.

Apolon points to in three separate performance evaluations completed by Jackson on

March 14, April 2, and October 18, 2012 in which he received all satisfactory marks in eighteen

categories of evaluation.  (*See* Technician Performance Evaluations (Doc. No. 35-7) at 2–4 (ECF

pagination); Quality Control Back-End Audit (Doc. No. 35-7) at 5–8 (ECF pagination).)

Similarly, in an audit completed by Jackson on October 10, 2012, Apolon received only

outstanding marks.  However, these evaluations are limited to specific work orders observed on

the day of evaluation – not overall performance over a more considerable period of time.

Furthermore, the evaluations span only seven months of Apolon's employment with Metro and

the latest evaluation was completed roughly nine months before Apolon's termination.  That

said, Lamberson did state that Apolon performed his job duties satisfactorily when paired as a

Helper with Service Technician Omar Mohammed.  (Lamberson Tr. 24:17–23.)

Despite these positive performance evaluations, the evidence demonstrates that Apolon

was not performing his job satisfactorily at the time of his discharge.  *See Lawson v. Getty*

*Terminals Corp.*, 866 F. Supp. 793, 801 (S.D.N.Y. 1994) (according "little weight" to

nonsupervisory employees' testimony that plaintiff was a satisfactory employee and finding

plaintiff's direct supervisor's "letter to be credible evidence of Lawson's poor job performance . .

. demonstrate[ing] that the defendants discharged Lawson because of his substandard work."). Even if the Court were to wholly discount the disciplinary memoranda related to access issues, Apolon was still written up on numerous occasions for his mistreatment of customers, coworkers, and Metro vehicles, as well as insubordination toward supervisors.

### iii. Legitimate Non-Discriminatory Reasons and Evidence of Pretext

Even if Apolon were found to be qualified, and has established a prima facie case, his claims fail based on the uncontroverted non-discriminatory reasons proffered by his employer, which Apolon cannot show are pretext for discriminatory action. Apolon points to three alleged incidents where his supervisors made discriminatory statements about his race or national origin.[11] First, Apolon alleges that during the altercation preceding his suspension and termination Jackson remarked "you have been used, abused, and beaten up in your country," and that such a discriminatory remark shows that Jackson was motivated by Apolon's race when he suspended Apolon. (Pl.'s 56.1 at ¶¶ 161–62; Pl.'s Opp'n at 6.) Next, Apolon alleges that Lamberson, who was involved in the decision to terminate his employment, made two discriminatory remarks in the months preceding his suspension and termination. Apolon alleges that Lamberson stated "here comes a monkey eating a banana with an eggplant in his hand" on February 1, 2013. (Pl.'s 56.1 at ¶ 103.) Apolon also alleges that Lamberson stated "Haitians are the worst" on May 24, 2013. (Pl.'s 56.1 at ¶ 108.)

---

[11] Apolon provides two additional allegations that do not support a finding of discriminatory intent. First, Apolon alleges he was paid less than similarly situated white employees. However, he makes no specific allegations regarding those similarly situated employees and fails entirely to support such a claim. Moreover, defendants have provided evidence that Apolon was in fact paid more than similarly situated white Service Technicians, including Joseph Walsh whom Apolon lists in his EEOC charge as an employee "who was treated better" than himself. (Defs.' 56.1 at ¶¶ 193–196.) Second, Apolon alleges that Lamberson's denied his requested vacation days. However, Apolon neither alleges nor provides any connection to a protected characteristic, and defendants point out that Apolon's request was properly denied pursuant to his Union's Collective Bargaining Agreement, which stated that he was not permitted to take vacation during the period that he requested. (Defs.' 56.1 at ¶¶ 190–191.)

Though Apolon's termination occurred shortly after the alleged statement by Jackson, the circumstances surrounding Apolon's termination do not establish an inference of discrimination. Jackson, although involved in the decision to suspend Apolon, was not involved in the subsequent decision to terminate his employment. *See Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009) ("[R]emarks made by someone other than the person who made the decision adversely affecting the plaintiff may have little tendency to show that the decision-maker was motivated by the discriminatory sentiment expressed in the remark.").

In regard to the alleged statements made by Lamberson, the Court notes that while Lamberson was a supervisory employee, the statements were made between five months and six weeks before Apolon's termination and the statements were unrelated to the decision making-process. In addition to these factors, Lamberson points to the same-actor inference, arguing that the fact that he both hired and fired Apolon undercuts any inference of discrimination in regards to his alleged statements. (Defs.' Mem. L. at 8.)

The Second Circuit has stated that "where the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire." *Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir. 2000) (quoting *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997)). "However, the same-actor inference is only a *plausible* inference, not a necessary one." *McCall v. Genpak, LLC*, No. 13-CV-1947 (KMK), 2015 WL 5730352, at *16 (S.D.N.Y. Sept. 30, 2015). Moreover, where the decisions to hire and fire "were made fairly remote in time . . . the same actor inference is not outcome-determinative." *Leon v. Columbia Univ. Med. Ctr.*, No.

11-CV-08559 (NSR), 2013 WL 6669415, at *8 (S.D.N.Y. Dec. 17, 2013), *aff'd*, 597 F. App'x 30 (2d Cir. 2015).

Here, Lamberson was aware of Apolon's race and national origin when he and Jackson interviewed Apolon for his position with Metro. Lamberson subsequently hired Apolon fourteen years prior to terminating his employment. While the fourteen year interval works against the same-actor inference, it is significant that Lamberson did not fire Apolon in response to his numerous disciplinary memoranda until 2013. "[I]n determining whether discrimination was a motivating factor for an adverse employment decision, evidence of an employer's non-discrimination should be considered as well." *Pasha v. William M. Mercer Consulting, Inc.*, No. 00-CV-8362 (RWS), 2004 WL 188077, at *7 (S.D.N.Y. Feb. 2, 2004), *aff'd sub nom. Pasha v. William M. Mercer Inv. Consulting, Inc.*, 135 F. App'x 489 (2d Cir. 2005); *see, e.g.*, *Schachner v. Beth Israel Med. Ctr., N. Div.*, 14 F. Supp. 2d 468, 471 (S.D.N.Y. 1998) ("Because defendants offered the same position to someone else with similar religious practices, an inference of discrimination cannot be drawn from their refusal to hire plaintiff."). Significantly, the parties both agree that termination would have been appropriate following Apolon's November 2012 insubordination incident. (Defs.' 56.1 at ¶ 100; Pl.'s 56.1 at ¶ 100.) The fact that Lamberson did not terminate Apolon in November 2012 cuts against a finding an inference of discrimination.

While statements showing an employer's racial bias may be sufficient to support a prima facie case of discrimination, the alleged statements here do not relate to Apolon's qualifications for the position and was made by the supervisor who initially interviewed Apolon before hiring him. *Cf. Tolbert v. Smith*, 790 F.3d 427, 438 (2d Cir. 2015) (finding a supervisor's racially offensive comments satisfied plaintiff's burden of establishing an inference of discrimination

where the comments concerned plaintiff's qualifications as a teacher and were made during the school year in which he was denied tenure).

As the uncontroverted evidence shows, on June 25 and 26, 2013, Jackson called Apolon as part of a phone response check. Apolon neither picked up nor returned any of Jackson's calls and, when Jackson finally reached Apolon by calling the Service Technician Apolon was working with, Apolon refused to turn on his company cell phone. The following morning, Jackson attempted to speak to Apolon about the insubordination upon seeing him in the parking lot. Apolon stated that he was not speaking to Jackson, who then warned Apolon he was speaking in a disrespectful manner to a supervisor. Jackson and Apolon then had a verbal disagreement, and Jackson eventually told Apolon to go home for the day.[12] Rather than leave, Apolon locked himself in another employee's company vehicle. Jackson told Apolon to get out of the car. Apolon refused and left Metro premises in the vehicle.

Due to Apolon's insubordination, he was suspended and Lamberson met with Metro's Director of Operations Robert Seidman and Metro's Vice President Krista Pasfield to review Apolon's personnel file. Lamberson, Seidman, and Pasfield decided to terminate Apolon's employment. Jackson was not part of this decision. Among the incidents that Lamberson, Seidman, and Pasfield considered were Apolon's insubordination in refusing to comply with the Metro phone policy and refusal to leave the company vehicle and Apolon's November 2012 insubordination, as well as the lengthy history of disciplinary memoranda in Apolon's file. As stated in Apolon's termination letter, his employment was terminated "based upon negative past

---

[12] Apolon alleges that as part of the verbal disagreement both he and Jackson each made a discriminatory remark to the other. However, the remarks were unrelated to Apolon's previous refusal to comply with Metro policy and they were unrelated to his work performance. Moreover, Jackson had written up Apolon for his insubordination before the incident in the parking lot. (6/27/13 Memo (Doc. No. 32-44) (noting that Jackson had written up Apolon for insubordination before attempting to speak to him the morning of the June 27, 2013).) That insubordination was the catalyst for the personnel file review, not the alleged remark. Additionally, Jackson was not part of the subsequent employment decision.

performance issues, as well as more recent disciplinary issues of unsatisfactory conduct and insubordination."  (Defs.' 56.1 at ¶ 170.)

Thus, the uncontroverted evidence demonstrates that Apolon was terminated because his misconduct at work was escalating and his performance deteriorating.   In fact, the parties agree that termination would have been appropriate following Apolon's November 2012 insubordination in refusing to complete an outdoor work assignment. (Defs.' 56.1 at ¶ 100; Pl.'s 56.1 at ¶ 100.)  Aside from the three alleged comments – none of which relate to Apolon's work performance – there is no other evidence of discriminatory animus in the record.  *Cf. Bookman v. Merrill Lynch*, No. 02-CV-1108 (RJS), 2009 WL 1360673, at *16 (S.D.N.Y. May 14, 2009) (denying summary judgment where supervisors' alleged discriminatory comments "were directly related" to plaintiff's work performance, including a comments that "the future of the office lay with young White brokers" and plaintiff was "wasting [his] time courting Black investors").  With respect to the comments, the comment closest in time to Apolon's termination was made by Jackson, who was not part of the committee that made the termination decision.  The remaining comments were not made close in time to Apolon's suspension and termination and were made by Lamberson – who not only hired Apolon,[13] but also issued punishments less serious than termination for previous instances of insubordination and misconduct.  *See Pasha v. William M. Mercer Consulting, Inc.*, No. 00-CV-8362 (RWS), 2004 WL 188077, at *7 (S.D.N.Y. Feb. 2, 2004), *aff'd* 135 F. App'x 489 (2d Cir. 2005) ("[I]n determining whether discrimination was a motivating factor for an adverse employment decision, evidence of an employer's non-

---

[13] The Second Circuit has stated that "where the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire." *Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir. 2000) (quoting *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997)).  "However, the same-actor inference is only a *plausible* inference, not a necessary one." *McCall v. Genpak, LLC*, No. 13-CV-1947 (KMK), 2015 WL 5730352, at *16 (S.D.N.Y. Sept. 30, 2015).

discrimination should be considered as well.").  For these reasons, summary judgment is warranted.[14]

### d.  Hostile Work Environment

"Hostile work environment claims are subject to demanding standards in order to avoid construing Title VII as a general civility code."  *Id.* (internal quotation marks and citation omitted).  To establish a hostile work environment, Apolon must show "that the discriminatory harassment was 'sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment,' and 'that a specific basis exists for imputing' the objectionable conduct to [his] employer.'"  *Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 1997) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)).  Finally, it is "axiomatic" that Apolon "show that the hostile conduct occurred because of a protected characteristic."  *Id.*

"This test has objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive."  *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (internal quotation marks omitted).  "As a general rule, incidents must be

---

[14] Apolon is not entitled to the mixed-motive analysis under *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244–45 (1989).  Not only does Apolon allege that he suffered adverse employment actions *exclusively* for illegitimate discriminatory reasons, but he also fails to establish a prima facie case under the less stringent standard of *McDonnell Douglas*.  *See Raskin v. Wyatt Co.*, 125 F.3d 55, 60 (2d Cir. 1997) (explaining "the plaintiff's initial burden in a *Price Waterhouse* mixed-motive case is heavier than the *de minimis* showing required to establish a prima facie *McDonnell Douglas* case"); *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1181 (2d Cir. 1992) ("In such a 'mixed-motives' case, the plaintiff must initially show more than the 'not onerous' *McDonnell Douglas–Burdine* factors."); *Abdallah v. Napolitano*, 909 F. Supp. 2d 196, 214 (W.D.N.Y. 2012) (finding plaintiff was not entitled to a mixed-motive analysis where "plaintiff has not alleged—nor did he argue in his submissions on summary judgment—that the decision to terminate him was motivated by both legitimate and illegitimate reasons.  Rather, plaintiff has steadfastly challenged the legitimacy of the reasons given for his termination, asserting grounds which were thoroughly considered and rejected by the court").

But even if a mixed-motive analysis were to apply here, Apolon's claims warrant dismissal as the unconverted evidence demonstrates that Apolon was fired due to his  gross insubordination against the backdrop of his lengthy disciplinary record.  *Price Waterhouse*, 490 U.S. at 252.  (requiring a defendant to demonstrate  "that its legitimate reason, standing alone, would have induced it to make the same decision.").

more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive. Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." *Id.* (internal quotation marks and citations omitted). "Acts that amount to mere utterances which engender offensive feelings in an employee do not sufficiently affect the conditions of employment to implicate a hostile environment claim." *N.Y.C. Health & Hosp. Corp.*, 682 F. Supp. 2d at 232 (citing *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993)).

Apolon fails to identify sufficient material facts showing that his work environment was objectively hostile or abusive. As discussed above, Apolon points to three discriminatory statements made by Jackson and Lamberson. Jackson's statement directed towards Apolon that he had "been used, abused, and beaten up in your country," and Lamberson's statements that Apolon overheard, "here comes a monkey eating a banana with an eggplant in his hand" and "Haitians are the worst." Two of these comments necessarily concern national origin, and the third may concern race. Nevertheless three offensive comments made during a fourteen year employment period "do not qualify as a steady barrage of opprobrious racial comments that altered the conditions of [] employment." *Tolbert*, 790 F.3d at 439 (internal quotation marks omitted) (referring to two offensive comments over a three year employment period); *see also Petrosino v. Bell Atl.*, 385 F.3d 210, 223 (2d Cir. 2004) (explaining "[s]imple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious)" are not sufficient to demonstrate a hostile work environment); *cf. Schwapp v. Town of Avon*, 118 F.3d 106, 112 (2d Cir. 1997) (finding "ten racially-hostile incidents" and "two other incidents which reflect bigotry . . . toward other minority groups" during a 20 month tenure may be sufficient to establish a hostile work environment).

Nor do the other alleged instances of hostility, considered alone or in sum, support a hostile work environment claim. *See, e.g.*, *Murray-Dahnir v. Loews Corp.*, No. 99-CV-9057 (LMM), 1999 WL 639699, at *4 (S.D.N.Y. Aug. 23, 1999) (finding claims that plaintiff was required to work longer hours, that his supervisors ceased direct communication with him, and that he was publically reprimanded and written up on numerous occasions insufficient to support a hostile work environment claim). Apolon has alleged other incidents that he believes were discriminatory, including the alleged pay discrepancy and denial of vacation days. However, as discussed previously, defendants have established that Apolon was, in fact, paid more than similarly situated white employees and the denial of his vacation days was proper. Moreover, Apolon fails to point to or provide a scintilla of evidence that his claims previously dismissed as time-barred were objectively discriminatory. The alleged events were infrequent, not physically threatening, and they did not unreasonably interfere with Apolon's work performance. *See Harris*, 510 U.S. at 23 (listing "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance" as relevant factors to determine whether an environment is hostile or abusive).

While isolated acts may be severe enough to create a hostile work environment, none of the allegations here meet such a threshold. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305–07 (2d Cir. 1995) (holding that a single instance of sexual harassment – a sexual assault carried out by two supervisors – may establish a hostile work environment). *Compare Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) ("Although Holdsworth made his obscene comments only on one occasion, the evidence is that he did so at length, loudly, and in a large group in which Howley was the only female and many of the men were her subordinates. And his verbal

assault included charges that Howley had gained her office of lieutenant only by performing

fellatio."), *with Curtis v. Airborne Freight Corp.*, 87 F. Supp. 2d 234, 251 (S.D.N.Y. 2000)

("Patterson's alleged comments are arguably racist because they appear to be based upon racial

stereotypes such as 'all African-American men like rap music' and 'African-American men hang

out on street corners doing nothing.' That said, Patterson's statements cannot reasonably be

considered anything more than an isolated racial slur. . . . [T]his type of isolated racial remark

'cannot, under any objective standard, suffice to create a hostile work environment.'" (internal

citation omitted)). Accordingly, the Court must grant summary judgment in favor of defendants

on Apolon's hostile work environment claim.

### e. Retaliation

Title VII provides that it is "an unlawful employment practice for an employer to

discriminate against any of his employees . . . because he has opposed any practice made an

unlawful employment practice by this subchapter, or because he has made a charge, testified,

assisted, or participated in any manner in an investigation, proceeding, or hearing under this

subchapter." 42 U.S.C.A. § 2000e-3(a). To establish a claim of retaliation, a plaintiff must

"establish a prima facie case showing that: (1) Plaintiff was engaged in a protected activity; (2)

the employer knew of the activity; (3) the employee suffered an adverse employment action; and

(4) there was a causal connection between the protected activity and the adverse employment

action." *N.Y.C. Health & Hosp. Corp.*, 682 F. Supp. 2d at 234–35. "[O]nce the plaintiff has

made out a prima facie case of retaliation, the defendant then has the burden of pointing to

evidence that there was a legitimate, non-retaliatory reason for the challenged action. If the

defendant meets that burden, the plaintiff must then demonstrate that there is sufficient evidence

upon which a reasonable jury could find the proffered legitimate reason merely a pretext for

impermissible retaliation." *Kemp v. A & J Produce Corp.*, 164 F. App'x 12, 15–16 (2d Cir. 2005).

### i. Abandonment

At the outset, the Court notes that Apolon has effectively abandoned his retaliation claim. "Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003); *see also Maher v. All. Mortgage Banking Corp.*, 650 F. Supp. 2d 249, 267–68 (E.D.N.Y. 2009) (collecting cases). Despite the considerable time spend by defendants in their opening brief addressing retaliation, Apolon entirely fails to oppose defendants' motion for summary judgment on his retaliation claim. Such a failure signals Apolon's abandonment of his retaliation claim. *Rinaldi v. Quality King Distrib., Inc.*, 29 F. Supp. 3d 218, 230 (E.D.N.Y. 2014) ("Plaintiff's failure to address Defendant's arguments in favor of dismissing her retaliation claim signals her abandonment of it.").

### ii. Protected Activity

Even if Apolon had not abandoned his claim, it is meritless. Apolon fails to even specify in his complaint what protected activity he predicates his retaliation claims on. He concedes that he did not make any complaints concerning the discriminatory statements allegedly made by Lamberson. (Def.'s 56.1 at ¶¶ 107, 109; Pl.'s 56.1 at ¶¶ 107, 109.) As best the Court can determine, Apolon predicates his claims on the July 26, 2013 grievance he filed with his union. (Pl.'s 56.1 at ¶ 152.)

Apolon's filing of this grievance does not constitute a protected activity because it did not put Metro on notice that Apolon was complaining of unlawful discrimination. *Bowen-Hooks*, 13

F. Supp. 3d at 222 ("[W]hile such complaints may be informal, they cannot be so vague or 'generalized' that the employer could not 'reasonably have understood . . . that the plaintiff's complaint was directed at conduct prohibited by Title VII.'" (quoting *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011))). The grievance makes no mention of, or reference to, unlawful discrimination. It describes Jackson's efforts to reach Apolon via another Service Technician after Apolon failed to respond to the phone check. It then states that the "phone call was harassment."

The grievance is ambiguous and generalized. No reasonable juror could find that it conveyed to Metro that Apolon was complaining of unlawful discrimination. *See, e.g.*, *Talwar v. Staten Island Univ. Hosp.*, No. 12-CV-33 (CBA), 2016 WL 1298969, at *11 (E.D.N.Y. Mar. 31, 2016) ("No reasonable jury could conclude that Dr. Talwar's generic complaints of unfairness at the January and August 2009 meetings were sufficient to put the Hospital on notice that she was complaining about discrimination."); *Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007) (finding that defendants were not put on notice that plaintiff felt she was being discriminated against on the basis of sex where plaintiff "never explicitly raised the issue of gender discrimination when she complained about her work" despite her assertion "that complaints from a female high-level manager about having to perform secretarial work clearly implied that she was being subject to sex discrimination").

Because Apolon has not engaged in any protected activity and has effectively abandoned any claim that he was retaliated against for any such activity, summary judgment is granted in favor of defendants on Apolon's claim of retaliation.

## II.    Apolon's § 1981 Claims

Apolon brings claims of race discrimination, hostile work environment, and retaliation in violation of 42 U.S.C. § 1981 against Metro and Lamberson.  For the reasons below, defendants are entitled to summary judgment on each § 1981 claim.

### a.   Time-Barred Claims

"Claims under Section 1981 are subject to a four-year statute of limitations period." *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 574 (S.D.N.Y. 2011); *accord Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004).  Apolon initiated this action on November 5, 2013.  Therefore, allegations of discreet instances of discriminatory conduct occurring before November 5, 2009 are not actionable.

### b.   Remaining Claims

Employment discrimination claims under § 1981 are evaluated under the same analytical framework as those brought under Title VII.  *See Patterson*, 375 F.3d at 221 (explaining that "[m]ost of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981"); *Bermudez*, 783 F. Supp. 2d at 576 ("Claims of employment discrimination under Section 1981 are analyzed under the same framework that applies to Title VII claims and claims under Section 1983."); *see also Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000) (analyzing § 1981 hostile work environment claims under Title VII framework); *Dickens v. Hudson Sheraton Corp.*, 167 F. Supp. 3d 499, at *15 (S.D.N.Y. 2016) ("Although § 1981 does not contain an explicit anti-retaliation provision, such claims are evaluated using substantially the same framework as Title VII . . . claims.").

In support of his § 1981 claims, Apolon refers to the same allegations that constitute his Title VII claims.  Accordingly, Apolon's § 1981 claims fail for the same reasons as his Title VII claims.  *See Patterson*, 375 F.3d at 225 ("[T]he factors justifying summary judgment dismissing Patterson's Title VII claim . . . equally support the summary dismissal of his claims for termination brought under 42 U.S.C. §§ 1981 and 1983."); *N.Y.C. Health & Hosp. Corp.*, 682 F. Supp. 2d at 237 (dismissing § 1983 claim for "the same reasons as the Title VII claim" where plaintiff alleged both violations based on the "same events").

### III.    Apolon's State Law Claims

Apolon's NYSHRL claims are similarly analyzed under the same framework as his Title VII claims.  *See Tolbert*, 790 F.3d at 439 ("Hostile work environment claims under Title VII and the NYSHRL are governed by the same standard."); *Bermudez*, 783 F. Supp. 2d at 587 ("Claims of retaliation under NYSHRL are treated the same as retaliation claims under federal law."). Therefore, his remaining causes of action – hostile work environment and retaliation in violation of the NYSHRL – are similarly dismissed for the same reasons as his Title VII claims.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted in its entirety.  The Clerk of Court is directed to enter judgment accordingly and close the case.

SO ORDERED.

Dated: Brooklyn, New York
          September 28, 2016

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge